**TRANS–WORLD–MARINE, INC., a Michigan corporation, Plaintiff–Appellant,**

v.

**BOUFFARD AGENCY; Hinton–Hill Marine, Ltd.; Defendants–Appellees,**

Canadian International Marine Underwriters, Ltd.; Lloyd's Underwriters; Institute of London Underwriters; Scottish Lion Insurance Company; United Fire & Casualty; Defendants.

No. 88–2008.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 8, 1989.

Decided Sept. 19, 1989.

Frank G. Becker (argued), Southfield, Mich., for Trans World Marine, Inc., plaintiff-appellant.

Arthur J. LeVasseur, Fischer, Franklin, Ford, Simon & Hogg, Detroit, Mich., for Bouffard Agency, defendant-appellee.

Robert Swickle (argued), Detroit, Mich., for Hinton–Hill Marine, Ltd., defendant-appellee.

Before MARTIN, MILBURN and BOGGS, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

Trans–World–Marine, Inc., a small marine towing and salvage company, appeals from a directed verdict entered at the end of plaintiff's proof in favor of Hinton–Hill Marine, Ltd., a British marine insurance broker. For the reasons stated below, we affirm.

Trans–World–Marine, Inc., is a family-owned Michigan corporation whose primary business is marine salvage and towing. Trans–World conducts operations out of

Detroit, Michigan and Fort Lauderdale, Florida. Peter Bill acts as the company's chief executive officer. In December 1984, Trans–World placed a. bid on a tug boat, known as the *Corwin,* being sold by the Supreme Court of Bermuda. The bid was successful and a bill of sale was executed February 1, 1985.

During the first week in February 1985, Trans–World acquired partial insurance for the *Corwin.* It purchased this insurance through H.R. Bouffard, an insurance firm in Quebec, Canada. Bouffard had received the insurance from Hinton–Hill Ltd., a London marine insurance broker, who in turn purchased it from four London underwriters. The *Corwin* was towed from Bermuda to Fort Lauderdale, Florida in early February 1985. There the ship underwent extensive repairs for the next several months. During this time Peter Bill extended essentially the same partial insurance coverage on the boat.

In September 1985, the *Corwin* was readied for its "sea trial." [1] On September 17, 1985, during its sea trial, the *Corwin's* starboard engine "seized," damaging itself and the ship. As a result, the *Corwin* was unable to complete its sea trial. On September 27, 1985, Peter Bill filed a claim with H.R. Bouffard for the engine "seizure" on behalf of Trans–World. Ultimately, repair of the engine cost Trans–World some $152,000. Both H.R. Bouffard and Hinton–Hill refused to pay Trans–World on the claim. Prior to this, in April 1985, Trans–World had filed a claim for the theft of certain electronic equipment from the *Corwin.* This claim was similarly denied by both H.R. Bouffard and Hinton–Hill. Because of repeated financial losses, Trans–World was forced to sell the boat in August 1986.

On May 30, 1986, Trans–World filed this diversity suit in federal district court against H.R. Bouffard, Hinton–Hill, and the London insurance underwriters. Amended complaints were filed June 30, 1986, and May 20, 1987. In its complaint,

Trans–World sought payment on the two insurance claims as well as incidental and consequential damages. On May 29, 1987, Trans–World dismissed its claim against the various underwriters for breach of insurance contract. Trans–World conceded that the insurance purchased did not cover its alleged losses. It asserted, however, that H.R. Bouffard and Hinton–Hill owed Trans–World a duty to obtain the requested coverage and, if unable to do so, to inform Trans–World of the coverage it did obtain.

Trial commenced on July 28, 1988. During the presentation of its case, Trans–World withdrew its claim for loss due to theft and settled the remaining claims against H.R. Bouffard. The case proceeded against Hinton–Hill. At the close of Trans–World's proof, Hinton–Hill moved for a directed verdict. The court granted the motion on the grounds that there was no breach of duty, no negligence, and no breach of contract to obtain a certain type of insurance. This appeal followed.

Trans–World here argues that Hinton–Hill failed to provide timely and understandable terms of insurance to Trans–World. It asserts that Peter Bill requested "all risk" insurance but that it received "port risk" insurance with "F.P.A. limitations" and with no "Inch Maree Clause" to cover latent mechanical defects. Trans–World asserts that it was misled into believing that the *Corwin* was fully covered. To evaluate these arguments we must carefully review the facts of this case, including the terms and facts peculiar to marine insurance.

On December 28, 1984, shortly after Trans–World was informed of its successful bid on the *Corwin,* Peter Bill began to discuss insuring the boat with Celine Blouin, an insurance broker for H.R. Bouffard, Inc. Blouin had provided insurance for the *Corwin* to its previous owners in Bermuda. There is some dispute between the parties as to who initiated the contact and as to what was discussed.

---

1. It is common for ships that have been laid up for extensive repairs and maintenance to undergo such a "trial" in which the ship executes a number of moves and maneuvers to test its systems.

It appears from the testimony that marine insurance is available in a number of forms to meet a variety of insurance needs. Marine insurance is nearly always one of two types: navigation insurance or port risk insurance. Navigation insurance insures a vessel when it is operating on the open seas or any navigable body of water. The cost of navigation insurance depends in part upon the value of the vessel, the type of work it performs and where it operates. The cost of navigation insurance may also depend upon whether a vessel is classified under Lloyd's Register of Shipping. This system categorizes and classifies vessels according to their navigability on the high seas. A vessel which is not classified under this system, for whatever reason, must generally pay a higher insurance premium. Port risk insurance covers a vessel that is sitting in port for a prolonged period of time. Because the risk on such a vessel is less than the risk on a ship being navigated on the high seas, the cost of port risk insurance is usually less.

The type of risk and the extent of loss insured can vary greatly depending on the coverage. "All risk" insurance insures a vessel for every loss from whatever source. It is roughly equivalent to a policy which insures against "all perils of the sea." "All risk" and "all perils" coverage are distinguished from insurance with an "F.P.A. limitation." F.P.A. stands for "free of particular average" and is derived from a French insurance phrase. Under F.P.A. insurance, a vessel is insured only for "complete and total loss," where the ship is lost or cannot be repaired, or "constructive total loss," where the cost of repairing the vessel would exceed the cost of its replacement. A vessel may also be insured for partial loss due to certain specified perils, such as fire, lightning, explosions and collisions.

Bill asserts that Blouin informed him that she had insured the previous owner of the vessel and that the tug had been "completely covered." Bill claims that he asked for the same "complete coverage" for the boat and he assumed this is what he received. Bill testified that Blouin did not explain to him the various types of insurance coverage available or what each entailed.

Blouin testified that she did discuss a variety of insurance coverage options with Bill. She explained that the boat had previously been covered by "all risk" insurance. She explained to Bill the meaning of this term, as well as the meaning of "F.P.A." Blouin asserts that she told Bill that the cost of insurance depends upon the type of coverage sought, the condition of the vessel, the intended use of the vessel, and whether the vessel was classified under Lloyd's Register of Shipping.

Blouin told Bill that she would try to obtain all risk insurance from the various insurance markets, including the London marine insurance market. In the meantime, Bill asked that he be given a copy of the policy which insured the previous owners of the *Corwin*. Blouin was unable to obtain a quote for all risk navigation coverage on the *Corwin* through February 1985. At that time, the *Corwin* needed repairs and was not within its previously held Lloyd's classification. Blouin was, however, able to obtain port risk and delivery trip insurance covering the *Corwin* while it was laid up in Bermuda, during its trip to Tracor Marine in Fort Lauderdale, and while it was laid up at Tracor Marine for repair and refurbishment.

On January 31, 1985, Hinton–Hill Marine, Ltd., an insurance broker in London, informed Blouin that it would be able to purchase port risk insurance for the *Corwin* plus delivery insurance for its tow from Bermuda to Tracor Marine, Fort Lauderdale. Blouin informed Bill of this insurance by telegram and confirmed it by mailgram on February 1, 1985. Trans–World accepted the offered insurance and paid for it by certified check on February 4, 1985. On February 19, 1985, Hinton–Hill effected a covernote for this insurance following instructions from H.R. Bouffard.[2] Hinton–Hill purchased this insurance from

**2.** A covernote is a binding insurance contract written in a sort of trade shorthand which memorializes the agreement between the parties in lieu of a formal insurance policy.

four insurers in the London marine insurance market: Lloyd's Underwriters, Institute of London Underwriters, Scottish Lion Insurance Co., and United Fire & Casualty.[3]

The coverage purchased was port risk and delivery insurance. It valued the *Corwin* at $500,000. For a premium of $5,000, this insurance covered the *Corwin* during its stay in Bermuda and tow to Fort Lauderdale from February 1 to February 5 plus 24 hours after its arrival. The risks covered by the insurance were those listed in the "American Institute Hull Clauses 2–6–77." These clauses are a standard document often incorporated by reference in marine insurance contracts. They provide coverage for a vessel against all perils of the sea. The clauses also contain an "Inch Maree Clause" which covers mechanical breakdown, including latent mechanical defects. The coverage provided for the *Corwin* by these clauses was, however, F.P.A., that is, limited to total loss and constructive total loss of the vessel. The covernote also provided for partial loss of the vessel due to fire, lightning, explosion, and collision in what is known in the insurance industry as a "4/4ths Running Down Clause." The insurance also included wind storm coverage, although this was subsequently deleted following the *Corwin's* tow to Fort Lauderdale. Blouin asserts Bill requested the deletion, but Bill denies any such request.

In early February 1985, the *Corwin* was towed without incident to Fort Lauderdale by another tug, the *Warrior*. At Tracor Marine in Fort Lauderdale, Peter Bill hired John Hiendlmays to assist in the repair of the *Corwin's* engines. He completed his work in April 1985. On April 16, 1985, Trans–World extended the port risk insurance it had purchased in February to cover the *Corwin* from March 15 through May 15, 1985. The value of the tug was increased to $1,000,000. This same insurance was extended again through December 1985 and was the coverage in effect on

September 17, 1985, when the ship's engine "seized" during its sea trial.

Upon review it appears that Trans–World's argument is wholly without merit. The district court properly concluded that Trans–World failed to provide any evidence showing that Hinton–Hill owed a duty to Trans–World. Its only duty was to comply with its instructions from H.R. Bouffard. Trans–World complains that it never received a written insurance policy from either H.R. Bouffard or Hinton–Hill. Trans–World did receive H.R. Bouffard's binding covernote on February 1 and a copy of Hinton–Hill's original covernote, which was attached to a letter from H.R. Bouffard to Trans–World dated March 19, 1985. Trans–World had no contact with Hinton–Hill. All of its insurance arrangements concerning the *Corwin* were made through H.R. Bouffard. It appears from the record that Hinton–Hill did exactly as it was instructed to do. Hinton–Hill owed no duty to Trans–World to ensure that Trans–World understood the terms of the insurance that Hinton–Hill was able to obtain. This obligation rested solely on the shoulders of H.R. Bouffard. Trans–World is bound by the actions of H.R. Bouffard, even if these acts are not what Trans–World intended or desired. Hinton–Hill fulfilled its duty in this case.

On reviewing a motion for directed verdict, we must consider the evidence in the light most favorable to the nonmoving party. *Rockwell International Corp. v. Regional Emergency Medical Services*, 688 F.2d 29, 31 (6th Cir.1982). When we construe the evidence in this fashion it is clear that Hinton–Hill was without liability.

The judgment of the district court is affirmed.

---

**3.** Trans–World originally named these insurers as defendants in this lawsuit but later dismissed them.